Mr. Brennan, is it Dion or Dion, your client's name? The appellant says it's interchangeable. I pronounce it Dion, your honor. Thank you. May it please the court. Yes. Mr. Brennan, for the appellant, Marshal Dion, I would ask the court if I could attempt to save two minutes for rebuttal. How many minutes? Two, your honor. Yes. Thank you. May I proceed? Yes, you may. Thank you. Your honors, the appellant was a 78-year-old man driving down an interstate highway, properly licensed, properly insured, committing no infractions other than speeding in a line of traffic driving 79 miles per hour in a 75-mile-per-hour zone with his out-of-state plate as he drove through Junction City, Kansas. Unbeknownst to him, a law enforcement officer from Junction City was sitting at the top of the highway deciding who was going to pass. Can we move to the appellant issues? Yes. Thank you. But we have read the facts. Are you saying the initial stop was unwarranted? I am not. All right. What are you arguing? The law enforcement officer had a right to stop Mr. Dion, and the scope of the stop in his duties should have been limited to writing him a motor vehicle citation. The officer asked Mr. Dion to get out of the car and to get into his cruiser. Notably, in the video that's attached, the officer looks into the back of Mr. Dion's car and also does not appear to have any safety concern whatsoever, turning his back away from Mr. Dion at points in that video. Inside the motor vehicle, the officer does not begin to write a motor vehicle citation. In fact, at least six minutes passes before he begins to write a motor vehicle citation. In those critical six minutes, he interrogates Mr. Dion, who he has stopped simply for a motor vehicle infraction, asking him questions, personal, intimate questions that have nothing to do with a motor vehicle citation. I believe the district court judge who held an evidentiary hearing, didn't she? She did. She found that most of the questioning went to questions about his identity. I don't think the record bears that out, Your Honor. He asked questions such as who he was seeing when he was in a different state, Pennsylvania. He asked him what his relationship was with the person that he was staying with. He asked him where he slept when he was with the female accountant that he had stayed with. He asked Mr. Dion where he got his money from. He asked Mr. Dion numerous personal questions that had nothing to do with his identification, his license, or the speeding ticket. Do you remember what the first question was? My sense was that the district court's account of it was that some of these questions were follow-up questions to answers to initial questions which were germane to the kind of questions that would go to identity or traffic issues. I don't think the record supports that analysis. There was during this prolonged interrogation or conversation that lasted 40 questions and over 20 minutes, there were many follow-up questions when the officer would provoke Mr. Dion into a conversation and then he would follow up Mr. Dion's dialogue. This officer created the platform to ask more questions than to follow up his own answers to questions that he had instigated. When he began, and it's on the videotape depicted in the evidence, when he began the conversation, he launched right into Mr. Dion asking him about where he got his money from and why he was in Pennsylvania and who he was seeing, what his relationship was. None of these things had anything to do with his identification or his status or the speeding ticket that he should have written. When you look at the video, although he pulls out a citation, you'll note that his pen is not even moving. He has his pen stationary and he's using it as a prop so that he can instigate conversation with Mr. Dion. That six critical minutes that passes prolongs this stop. And although many cases show that prolonging the stop after a citation is given is unconstitutional and illegal, prolonging it during the stop should have the same effect. And that is exactly what this officer did. He prolonged the stop at least six minutes in the beginning before he even began looking or attempting to get information regarding background, criminal record check, III, inviting the citation. He created his own door to walk into to incriminate Mr. Dion. So the first argument I make is that he had no right to do that. He prolonged the entire stop. Therefore, the entire stop is unlawful. If the entire stop is unlawful, then any statements Mr. Dion made during that stop and interaction should be inadmissible. And so the government will suggest that Mr. Dion gave consent at different points during this interaction. And it is true. Mr. Dion at three points during this interaction said that the officer could look in his car. However, where Mr. Dion's communication and stop with the officer was unlawfully delayed, Florida v. Reuter and also the other cases cited say that it's not just a matter of voluntariness. Even if it's a voluntary statement, if it's a product of this illegal, unlawful stop, then therefore the statement should be suppressed. So the fact that he told the officer after the citation was issued that he could look in the car is irrelevant because it's irrevocably tainted by this prolonged investigation that shouldn't have taken place in the first place. Can I just go back to the questioning when the way the district court recounts it, he gets the license and it listed a post office box address in Arizona and the registration listed an address for the truck. At which point the officer then inquires where he was coming from and then gets answers that the officer seems not sure make a whole lot of sense. So that aspect of the encounter is problematic? No. I recognize that a police officer can ask about basic itinerary. And when he sees a post office box and a car registered at an address, although they're not inconsistent, I do not think that follow-up is illegal or improper. So where, I guess, is what I'm trying to get at in the encounter, do things take a turn where you think the officer is asking a question that it has no basis for? What's the moment in the encounter where that turns? As soon as they get into the car, the video starts from an angle facing Mr. Dionne and the officer and he launches into immediately saying, what do you do for a living? Where do you get your money? That has nothing to do with itinerary. That has nothing to do with speeding. That has to do with personal questions because this is an officer who drug profiles people and he wants to get information that he can create his own suspicion with. Mr. Dionne answers almost every question that this police officer asks. But quickly after he asks about his income and his money, he begins to ask the personal questions about his relationship with his accountant. So you want us to rule that personal chatter unrelated to the stop should be barred? I don't believe it's personal chatter when you consider the officer's state of mind, when you consider what he is trying to achieve, which he concedes in the videotapes post-arrest that he's looking for drugs and his whole agenda is to find drug couriers. And when you consider that, this isn't mere chatter asking about a sporting event or the weather. He's asking personal intimate questions because he's trying to provoke responses that he can then try to create his own foundation to say that he has suspicion when none exists to begin with. What's the significance to you of the fact that before they get in the car, according to the record, at least the district court found that your client had already at that point offered to have the officer look in his truck? When Mr. Dionne gets out of his car, the officer begins to look in the back. The officer looks in the back of his car and then he says to Mr. Dionne that he's concerned about weapons. Mr. Dionne says, you can look if you want. And so while that may seem by the district field consent, I suggest three things. One, I suggest that is in response to the concern for weapons. And so his consent to look for weapons is limited to what he said for the weapons. Secondly, the officer never takes up his invitation to look in the car at that point. Wholly ignores it. Third, the officer's conduct underlies or underscores the fact that he doesn't have a concern for weapons. Later in the video, he comes out and turns his back to Mr. Dionne, reaches down to the rear well with Mr. Dionne behind him without even looking at him. And by the time he gets back out of the car, all the conduct of the officer has then tainted whatever consent would have existed if it did. I don't understand your point. The officer is concerned about weapons. They may be in the truck. They may be on your client. Turning his back on your client if weapons are in the trunk or in the back of the truck wouldn't seem to indicate anything. It seems to me, Your Honor, that all of the officer's conduct is inconsistent with the concern for weapons. Generally saying that there's a concern for weapons is not a specific articulable basis. When they both go to the police cruiser, he never pats down Mr. Dionne. The appellant sits next to him for over 20 minutes. He never even keeps eye contact with him, let alone touching him or searching him. That seems to reinforce the way I look at it, not the way you look at it. Okay, you have two minutes of rebuttal later. Thank you. Good morning. May it please the Court, John Alex Romano on behalf of the United States. The search of Mr. Dionne's vehicle that resulted in the recovery of a large amount of currency was supported by a probable cause. Mr. Dionne was not detained in violation of his Fourth Amendment rights before that search occurred. What was the state charge against him? I'm sorry, Your Honor? What was the state charge against him when he was placed under arrest? I believe it was for trafficking, containing evidence of the proceeds of drug trafficking, that would be the money. And certainly, at no point did it result in the events leading up to the recovery of that quantity of currency of $800,000. Was there a violation of his Fourth Amendment rights? The initial stop of the vehicle for speeding was lawful, and the traffic stop that ensued was reasonable in both scope and duration. Officer Blake performed measures related to the purpose of the stop. For example, he checked on Mr. Dionne's license and registration. He asked follow-up questions. One of the first things that Mr. Dionne told him was that he was traveling across country from having visited his CPA. That is certainly not a logical impossibility, but it's somewhat unusual, I would venture. So certain questions about what Mr. Dionne, who appeared to be a retirement agent, did for a living, were appropriate follow-up questions. Officer Blake also took valid safety-related measures, asking Mr. Dionne to exit his vehicle and sit with him in the police cruiser, looking in the back of Mr. Dionne's vehicle, which had tinted windows. It could have had weapons there. There could have been other individuals there. Performing a background criminal check on Mr. Dionne. Why was asking what he did for a living pertinent to the fact that the car was speeding, the truck was speeding? It's not your honor, but I understand that even my opponent to concede that asking about travel itinerary is a valid question. It's certainly what he was driving. Yes, but you just shifted from what he did for a living to itinerary. Yes, Your Honor. Our view is that what he did for a living is a valid, legitimate follow-up question to itinerary, because he says, and this is while he's still in his own vehicle, that he's coming from having met with his CPA in Pennsylvania, which again is an illogical impossibility, but it does invite a follow-up question as to what Mr. Dionne did for a living. But certainly, if this court were to find, for whatever reason, that the scope of a lawful traffic stop was exceeded under the circumstances here, we believe that any additional detention of Mr. Dionne was justified by reasonable suspicion, by information that Officer Blake learns during the course of the stop. I'm having trouble tracking the legal standard that you want us to apply. Is the idea that there's probable cause, or the idea that there's reasonable suspicion? Reasonably, ultimately, the search is justified by probable cause. But in order to get to the initial search, which was consensual, but then it gets suspended, either the traffic stop has to have been lawful in its entirety, or if it was not, then the additional detention up to that initial search... You mean the ultimate search of the truck has to be supported by probable cause? Correct, Your Honor. That is our argument. And you're not relying on consent for that search? Correct, Your Honor. The way it played out, there was an initial search of the vehicle. And our position is that that initial search was justified by consent, that it was voluntary. But then Mr. Dionne goes agitated... And goes deeper into the truck. Exactly. And then the officers suspend the search. And then Officer Blake asks Mr. Dionne if he can run his drugs if he can around the car. And at that point, there's a detection of the odor of narcotics by the canine. And our view is that whether or not there was a revocation of consent, certainly at that point you have probable cause. And probable cause is the right standard that you have to meet for that search? Correct. And just going back to the reasonable suspicion factors, because they do ultimately also tie into the later probable cause analysis. You have Mr. Dionne's continued nervousness. And Officer Blake was very specific in his testimony. He said that normally drivers, that nervousness will abate when they understand that they're going to get a warning. Well, that wasn't so in Mr. Dionne's case. He was nervous throughout the entire encounter. You have repeated unsolicited offers by Mr. Dionne to let Officer Blake search the vehicle. You have an indirect travel route. Mr. Dionne said he was traveling from Yardley, Pennsylvania to Tucson, Arizona. And yet the stop occurred on I-70 in Kansas. And as Officer Blake testified, a more direct route would have been for Mr. Dionne to head sort of southwest on I-44 and then west on I-40. Then of course you have the fact that Mr. Dionne lied about his criminal history. He told Officer Blake that he had only been convicted of possession of marijuana. Well, in fact, the criminal history check through dispatch and through the El Paso Intelligence Center reveals that he had been convicted of drug trafficking events involving cocaine and marijuana. And one arrest of Mr. Dionne would have involved the seizure of 800 pounds of marijuana. So all of that would justify... That was a 25-year-old event, right? Correct, Your Honor. But it is still entitled to some weight. And the fact that Mr. Dionne lied about it is really what is significant. That is our point. He's being deceptive to Officer Blake. So you have all of those reasonable suspicion factors, we believe, that would go ultimately to pro cause as well. And you have additional factors that the officers learn through the consensual search of the  When the vehicle is suspended, the back of the vehicle appears to contain a cover load, junk type items, old boxes, old atlases, that in Officer Blake's training and experience were consistent with what smugglers might use. You have the positive indication to the presence of narcotics by the drug-sniffing canine, which is entitled to a probable cause. At the point the consent was revoked, they hadn't found anything. Correct, Your Honor. So why would he not have been free to leave at that point? Your Honor, because, well, to begin with, he consented to walking the dog around the vehicle. And two, if he had not, there was still reasonable suspicion that would justify his continued detention for the additional 30 seconds to a minute that it would take to walk the dog around the vehicle. But the video does show that Mr. Dion did agree to let Officer Blake walk the dog, the drug-sniffing canine, around the vehicle. So you have the detection of the odor of narcotics by the dog. You have the apparent cover load in the back. You have Mr. Dion's growing education as he realizes the officers aren't just going to take a look in the back of the trunk and leave, that they're actually going to search, which suggests that he was concerned that they were going to find something in the back of the truck. And finally, relevant to probable cause, you have his response to Officer Blake's question. When Officer Blake asks him, are you carrying a large amount of currency? And he sort of stumbles over the response. He says, pardon me? And then he says that he used to make deposits and he had around $6,000. Well, that sort of indicates he was caught off guard. And if you contrast that response to his response to the immediately preceding questions posed by Officer Blake about whether he was carrying specific drugs, it was a very confident no, no, confident responses by Mr. Dion. But then when you get to the question about the contraband, he's usually caught off guard. So that's also relevant to the probable cause analysis. I realize that it is not your problem, but when I finished my reading for today, I don't know if it's you or one of your colleagues will be arguing that the fact that someone wasn't nervous enough, that that was suspicious conduct. Certainly not. If they maintained their calm and cool collect, that that created suspicion in the officers. I understand you're referring to a later case being argued this morning. I don't know if that's yours or somebody else's. It's on my case. I would just say this. We recognize that flaw. I'm just trying to figure out. It just seems that anything, any innocent behavior has the possibility of creating suspicion in the minds of, subjectively in the minds of a police officer. I would say that, I understand your question and concern. But I would say that the facts of this case really do show that any subjective suspicion by the officer, and again, that's sort of not legally relevant, but any subjective suspicion was warranted, particularly when you consider the fact that Mr. Dion lies about his criminal history. And you have an unusual statement from the start of the encounter, which is that I'm traveling across country for visiting my CPA. And then you have the indirect attorney. So I'll just conclude by saying that all of the factors present here, I think, warranted reasonable suspicion under subjective or the appropriate objective analysis. I would ask the court to affirm. Just one last thing. I just keep getting tripped up when you give the standard for the search, the actual final search. Correct. You're saying you have to meet the probable cause standard, not the reasonable suspicion standard. Correct. I would respond to Judge Johnson's question about suspicious factors. But yes, ultimately, the final search has to be justified by probable cause. I apologize. If I'm sorry, I get it, though. Nothing went beyond the thing that created the reasonable suspicion creates the probable cause. The detection by the drug-sniffing canine, the apparent cover. Am I right? I guess I thought there was some, maybe I'm, the unfortunate fact of having many suppression cases here today, but I thought there was some dispute about that canine sniff detection in this particular case, and that there was, the government's theory was perceiving, potentially on the assumption that we could discount that. Is that wrong? Or is that necessary for your? Ultimately, it's not. We think it makes it easier for probable cause. But you argue to us that you win even if we discount that. Correct. So if we discount that, what is beyond the thing that creates the reasonable suspicion, the extra thing that would satisfy the probable cause standard with respect to the search? Discounting the drug-sniff, you have the apparent cover, the cover load in the back of the vehicle that gets detected during the initial search. You have Mr. Dean's growing agitation to get back on the road as he realizes officers are going to search. So it's not just that they don't find something, but they find a cover load. Correct. That's how you put it. Correct. Thank you. Thank you. May I? You may. Thank you. Judge Thompson's comment is the point I was trying to make, talking about how infectious this six-minute delay was when Mr. Dion and the officer first got into the officer's car. When they first got into the car, the officer waited six minutes before he began to run a criminal record check. So nothing was done to further the event of a traffic ticket for six minutes. And in that six minutes, it's not just that it was personal questions. An officer or law enforcement personnel can ask anything to provoke, to promote, to delay, to prolong an event so that there's something making claims objectively they think is suspicious. If the person's not nervous, if they're too nervous. If the person has an itinerary they don't care for. It's not as if the appellant said he was coming from Alaska and it was a totally different direction. There are numerous roads that come from Pennsylvania. This one was just not to the officer's liking. So he justified that he could then ask personal questions that had nothing to do with this ticket. The itinerary that is considered by the courts is basic information about where the person is coming from to see if it's accurate or a lie. Not to do a Google search, to have a screensaver of drugs and then intimidate and oppress the passenger, the citizen by saying that's what I'm looking for. And creating not only a subjective state of mind in the officer, but then objectively to the passenger that they shouldn't be nervous because they know they are now a target. That happens before he even runs a criminal record check. Are you suggesting that we should disregard the findings of fact by the district court judge in favor of our view of the video? I don't think that we should disregard the findings of fact by the court, but when you look at the video, there are many more facts not listed in the district court's findings that are beneficial to the appellant. Are you saying that the district court clearly erred? Which would be the standard, I think. I don't think the district court erred in their listing of the facts. I don't think the district court included all the favorable facts of the appellant. Thank you. Thank you. Thank you.